UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM DORTON,

       Plaintiff,                         Case No. 16-cv-10202
                                          Hon. Mark A. Goldsmith

vs.

KMART CORPORATION and
WHYNOT LEASING, LLC

       Defendants.

_____/

## OPINION & ORDER
## GRANTING DEFENDANTS' MOTION TO DISMISS (Dkt. 25)

Plaintiff William Dorton filed his amended complaint against Defendants on June 6, 2016, alleging that Defendants violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. ("ECOA"), when they communicated with Dorton regarding his application to lease a videogame system made at one of Defendant Kmart's Detroit, Michigan, locations. See generally Am. Compl. (Dkt. 19).[1] In lieu of an answer, Defendants filed a motion to dismiss on June 28, 2016, which makes alternative arguments that the complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) and/or 12(b)(6) (Dkt. 25). The issues have been fully briefed, and a hearing was held on November 9, 2016. For the reasons set forth below, the Court grants Defendants' motion to dismiss.

---

[1] The amended complaint also alleged that Defendants violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. See Am. Compl. ¶ 1. However, Dorton has voluntarily dismissed this claim (Dkt. 33).

1

## I. BACKGROUND

Defendant Kmart is a retail store that sells, among many other things, videogame systems. See Am. Compl. ¶¶ 24-25. Defendant WhyNot Leasing is a company "partnered with" Kmart, which offers alternative financing by providing Kmart customers "an option to purchase the product at the end of [a] lease term." Id. ¶¶ 7, 13(a).

Dorton is an individual who, on May 2, 2014, went to a Kmart location to purchase a videogame system. Id. ¶¶ 24-25. Because Dorton was unable to pay for the videogame system in full at that time, he sought to obtain the videogame system under Defendants' "WhyNotLeaseIt" program (the "Program"), id. ¶¶ 29-31, which permits a customer to lease the product for a term of months and, if he so chooses, to purchase the product at the end of the lease term, id. ¶ 13. As a first step in this process, Dorton furnished Defendants with his social security number; Kmart's salesperson, however, told Dorton that someone else's information was associated with that social security number. Id. ¶¶ 33-34. The salesperson told Dorton that, as a result of the confusion surrounding the social security number, Dorton was not eligible for the Program. Id. ¶ 37.

Dorton alleges that the salesperson did not provide him with the information necessary to identify the source of the inaccurate information concerning the social security number. Id. ¶ 42. However, Dorton does not allege that he requested any such information from the salesperson. See id.

On June 3, 2014, Dorton claims that he sent Kmart a letter "pursuant to 15 U.S.C. § 1961(d)," requesting an "adverse action notice" and specific reasons for the "adverse action" taken. See Am. Compl. ¶ 44. As discussed fully below, when certain criteria are met, a creditor is required to issue these notices to a "credit applicant," usually when the creditor denies that applicant's application for credit. The only reply that Dorton received was a handwritten letter

2

from Kmart stating that they were referring his request to the "lease company," which Dorton identifies as Defendant WhyNot Leasing. Id. ¶¶45-47.

## II. STANDARD OF DECISION

Subject-matter jurisdiction is always a "threshold determination," American Telecom Co., L.L.C. v. Republic of Lebanon, 501 F.3d 534, 537 (6th Cir. 2007) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998)), and "may be raised at any stage in the proceedings," Schultz v. General R.V. Center, 512 F.3d 754, 756 (6th Cir. 2008). "A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir. 2004). "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." Gentek Bldg. Products, Inc. v. Sherwin–Williams Co., 491 F.3d 320, 330 (6th Cir. 2007). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

In evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[c]ourts must construe the complaint in the light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief." Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010). To survive a motion to dismiss, a complaint must plead specific factual allegations, and not just legal conclusions, in support of each claim. Ashcroft v. Iqbal, 556 U.S. 662, 678-679 (2009). A court may consider exhibits attached to the complaint without converting the motion to one for summary judgment. Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 680-681 (6th Cir. 2011).

3

### III.  ANALYSIS

The ECOA exists to prevent discrimination by creditors against certain classes of credit applicants.  See Mays v. Buckeye Rural Elec. Coop., 277 F.3d 873, 876 (6th Cir. 2002); 15 U.S.C. § 1691.  As part of its scheme to create accountability for creditors' decisions, the ECOA imposes certain notice obligations on creditors when they take "adverse action" against a credit applicant, which is typically a denial of credit.  See id. § 1691(d)(6) (defining "adverse action" as, inter alia, "a denial or revocation of credit"); id. § 1691(d)(2) (general notice requirements).

For purposes of this motion, Defendants concede that they did not provide Dorton with an adverse action notice.  See Defs. Mot. at 5.  The parties' dispute is twofold:  (i) whether Defendants were required to provide Dorton with an adverse action notice; and (ii) if such notice was required, what that notice should have contained. Generally speaking, an adverse action notice must contain "a statement of reasons for such [adverse] action" that is "specific." 15 U.S.C. § 1691(d)(2), (3). Dorton complains that he was harmed when Defendants did not comply with his request for an adverse action notice, see Am. Compl. ¶¶ 48-49; additionally, he argues that a proper "statement of reasons" includes "the information necessary to identify the source of the inaccurate information concerning his Social Security Number." Id. ¶ 42.

#### A.     **Subject-Matter Jurisdiction**

Defendants argue that this Court lacks subject-matter jurisdiction because Dorton lacks standing.  See Defs. Mot. at 3-4; see also Fed. R. Civ. P. 12(b)(1).  Specifically, Defendants claim that Dorton lacks standing because he has not alleged a "concrete and particularized" injury. Id. at 4 (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-181 (2000)). Defendants assert that, even after the complaint was amended, Dorton's allegations of harm merely speculate that, had Defendants provided him with the requested adverse action notice, such notice

4

"may have allowed him to correct his consumer reports and prevent future damage." Id. at 4 (quoting Am. Compl. ¶ 48) (emphasis by Defendants). To allege sufficiently a concrete and particularized harm, say Defendants, Dorton at least had to claim that Defendants' actions caused — not "may have caused" — his injury.

Moreover, claim Defendants, even assuming that Dorton had alleged a non-speculative harm flowing from his inability to identify the "source" of the inaccurate information, this harm cannot be attributed to Defendants, because Defendants have no statutory duty to provide such information. Id. at 5-6. Assuming for the sake of argument that Defendants are "creditors" subject to the ECOA, Defendants claim that a creditor need only provide a "short, check-list statement" that "reasonably indicates the reasons for adverse action." Id. at 6 (quoting O'Dowd v. S. Cent. Bell, 729 F.2d 347, 352 (5th Cir. 1984)). As Defendants interpret this requirement, it does not entitle Dorton to the "source of the reported reason for denial" under the statute. Id. (citing Anderson v. Capital One Bank, 224 F.R.D. 444, 447 (W.D. Wis. 2004)). Accordingly, say Defendants, Dorton lacks standing to claim he was injured by a failure to receive information to which, under their view of the statute, he was not entitled. Id.

Dorton counters that he did allege a harm that meets Article III's standing requirements. See Pl. Resp. at 8-9. Dorton says his injury was not speculative, because he alleged exactly what the statute prohibits — a failure to deliver a requested adverse action notice. See Pl. Resp. at 7. For standing purposes, Dorton's response fails to discuss his original claim that he suffered specific harm from the lack of "source" information, see id. at 7-11; instead, he focuses his argument on the fact that "Defendants were required to provide adverse action notices yet failed to do so when required," id. at 7, notwithstanding the content of the notice.

5

"[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (quoting Lujan, 504 U.S. at 560).

Again, Defendants' standing argument takes two forms: (i) that Dorton's claimed injury flowing from a lack of "source" information was speculative; and (ii) that, in any case, an adverse action notice did not have to contain "source" information. The parties' dispute about the required contents of an adverse action notice, however, does not bear on standing; standing "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." Warth v. Seldin, 422 U.S. 490, 500 (1975). "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Flast v. Cohen, 392 U.S. 83, 99 (1968); see also Jenkins v. McKeithen, 395 U.S. 411, 423 (1969) ("[T]he concept of standing focuses on the party seeking relief, rather than on the precise nature of the relief sought."). The Supreme Court has stated:

> [T]he district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another, unless the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous. Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is so insubstantial, implausible, foreclosed by prior decisions of this

6

> Court, or otherwise completely devoid of merit as not to involve a federal controversy.

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (internal quotations and citations omitted) (emphasis added).

Defendants' argument concerning the proper contents of an adverse action notice is, fundamentally, a merits question about the meaning of the statute. See Defs. Mot. at 5-6. Defendants' argument is that Dorton's interpretation of the ECOA requires a notice that "goes beyond the statutory requirements," and that he therefore lacks standing. Id. at 6. Dorton's contention is that the ECOA does afford him a right to an adverse action notice that satisfies certain statutory criteria as he interprets them, and that he did not receive such a notice. This dispute poses a legal question that must be decided independently of the threshold standing question. Dorton, if he prevails on this legal issue, could find himself entitled to relief. Dorton does not lack standing simply because this Court might agree with Defendants' interpretation of the scope of the ECOA. See Steel Co., 523 U.S. at 89.

Turning to Defendants' argument about the speculative nature of Dorton's claimed injury, Defendants are correct that Dorton's complaint never conclusively alleges that the identity of the source of the information would have enabled him to fix the problem and avoid injury. Thus, it appears that Dorton has not shown how the "actual damages" allowed under Section 1691e(a) resulted from defendant's violation of the ECOA. Defendants' first motion to dismiss, which was mooted by Dorton's amended complaint, made the point that Dorton's injury-in-fact allegations were insufficient. See Defs. First Mot. to Dismiss at 4 (Dkt. 13). Yet, Dorton's amended complaint merely claims that Defendants' actions "deprived him of information which may have allowed him to correct his consumer reports." Am. Compl. ¶ 48 (emphasis added); see also id. ¶ 41 (Dorton "anticipated" that an adverse action notice with source information would permit him

7

to rectify the misinformation).[2] Moreover, Dorton's response to Defendants' motion does not shore up his amended complaint's shortcomings; in fact, the response appears to concede that Dorton can only show harm, if at all, under the cause of action for punitive damages, see Pl. Resp. at 8-9 ("the ECOA plainly provides for statutory punitive damages in the absence of 'actual damages'").

Dorton has alleged, however, that Defendants failed to provide him with the notice to which he was entitled. See Am. Compl. ¶ 43. Although he apparently concedes that he has not pleaded any actual damages, Dorton argues that relief is still available under the portion of the ECOA permitting him to recover punitive damages. See Pl. Resp. at 10; 15 U.S.C. § 1691e(b). This Court agrees; notwithstanding his failure to plead actual damages, Dorton has adequately pleaded a violation of the ECOA sufficient to confer standing by alleging Defendants' total failure to provide him with an adverse action notice, the lack of which caused him an injury apart from a lack of "source" information.

"The actual or threatened injury required by [Article] III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." Warth, 422 U.S. at 500. Stated differently, "Congress . . . has the power to create new legal rights, and it generally has the authority to create a right of action whose only injury-in-fact involves the violation of that statutory right." Carter v. Welles-Bowen Realty, Inc., 553 F.3d 979, 988 (6th Cir. 2009); see also Beaudry v. TeleCheck Servs., 579 F.3d 702, 705-707 (6th Cir. 2009). That said, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to

---

[2] At one point, the amended complaint does assert that Dorton "suffered," see Am. Compl. ¶ 38. However, this injury occurred because he was an "an identity theft victim," id., not because of any act of Defendants.

8

authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation." Spokeo, 136 S. Ct. at 1549.

Defendants invoke Spokeo for their argument that Dorton lacks standing because he has not alleged a harm distinct from the denial of his procedural right to an adverse action notice under the ECOA. See Def. Mot. at 4; see also Notice of Supp. Authority (Dkt. 35). However, Dorton is not alleging that his rights were denied due to the type of "bare procedural violation" that "may result in no harm" — an allegation that Spokeo deemed insufficient to confer standing. See Spokeo, 136 S. Ct. at 1550. Here, we are faced with an allegation that Defendants completely failed to satisfy any of the ECOA's notice requirements, coupled with a claim that this failure deprived Dorton of useful information to which he was entitled. See Am. Compl. ¶¶ 47-49. The injury to Dorton was complete upon the denial of the adverse action notice, notwithstanding whether receiving the notice would have avoided further, actual damages; the ECOA entitles a credit applicant to an adverse action notice for the applicant's benefit, regardless of what the notice reveals. See Tyson v. Sterling Rental, Inc., 836 F.3d 571, 576-577 (6th Cir. 2016) ("the [ECOA's] notice requirement is intended to provide consumers with a 'valuable educational benefit' and to allow for the correction of possible errors '[i]n those cases where the creditor may have acted on misinformation or inadequate information'" (quoting S. Rep. No. 94-589, at 4 (1976)) (emphasis added). If true, Defendants' failure caused a specific harm to Dorton by denying him access to material information about his creditworthiness and an opportunity to investigate whether this information was accurate.[3]

---

[3] This fact distinguishes the present case from Meyers v. Nicolet Restaurant of De Pere, LLC, 843 F.3d 724 (7th Cir. 2016), which Defendants cited in a Notice of Supplemental Authority dated January 20, 2017. That case concerned a statute that provided statutory damages to those who receive a credit card receipt that is not properly redacted. There, standing was lacking because the plaintiff "discovered the violation immediately and nobody else ever saw the non-compliant

Dorton's case more closely resembles Federal Election Commission v. Akins, 524 U.S. 11 (1998). Akins concerned the Federal Election Campaign Act of 1971, which required organizations satisfying certain criteria to publicize information concerning their donors, as well as their campaign-related contributions and expenditures. Plaintiffs were "a group of voters" who challenged the Federal Election Commission's refusal to require a certain lobbying entity (AIPAC) to make disclosures under the statute. Id. at 13. When the Commission challenged plaintiffs' Article III standing, the Court stated:

> The "injury in fact" that respondents have suffered consists of their inability to obtain information — lists of AIPAC donors . . . , and campaign-related contributions and expenditures — that, on [plaintiffs]' view of the law, the statute requires that AIPAC make public. There is no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election. [Plaintiffs]' injury consequently seems concrete and particular.

Id. at 21. As in Akins, Dorton is Congress's intended recipient of certain information. See Tyson, 836 F.3d at 576-577. And, like the plaintiffs in Akins, who did not allege more than a general inability to use the information denied to them (whatever that unknown information might reflect), Dorton met his burden of alleging that this information "would help" him achieve the purpose of the statute, i.e., "to assist him in understanding the reason for his denial," Am. Compl. ¶ 49.

By discounting the type of injury that Dorton claims to have suffered here, Defendants' interpretation of an ECOA claim that is sufficient to confer Article III standing would require a claim of actual damages. But Defendants concede that "several courts" have stated that proof of

---

receipt." Id. at 727. In other words, the statute in Meyers was designed to prevent a very specific type of harm, which the facts showed could not have occurred. Here, on the other hand, Dorton was denied information meant to provide him with an educational benefit. See also n.5, infra.

10

actual damages is not required to succeed on an ECOA claim. See Defs. Mot. at 15 n.9 ("several courts have stated that proof of actual damages is not a prerequisite to recovery"). Defendants argue, however, that these cases are distinguishable because "in each case the plaintiff actually pled some form of [actual] damages." Id. (citing Stoyanovich v. Fine Art Capital LLC, 06-CIV-13158, 2007 WL 2363656, at *3 (S.D.N.Y. Aug. 17, 2007); Cherry v. Amoco Oil Co., 490 F. Supp. 1026, 1029 (N.D. Ga. 1980)).

Defendants do not further elaborate on why this distinguishing fact is relevant, and the cases cited by Defendants do not actually identify the actual-damages pleadings as the reason why other damages (i.e., punitive damages) were available; they merely explain that, e.g., the ECOA "nowhere states that sustaining actual damages is a predicate for establishing liability under the statute." Stoyanovich, 2007 WL 2363656, at *3; see also id. (actual damages are "not . . . an element of ECOA liability"). Nor can the Court conceive of a reason behind such a requirement. Rigidly requiring a plaintiff to plead actual damages to recover unrelated punitive damages would create a meaningless "magic-words" requirement to obtaining punitive damages. Moreover, the statute itself shows that an action for punitive damages can exist by itself: Section 1691e(d) provides for fees and costs "in the case of any successful action under subsection (a), (b), or (c) of this section." (Emphasis added.) Subsection (a) is the subsection dealing with actual damages "sustained by" the credit applicant, while subsection (b) pertains solely to punitive damages and contains no requirement that a plaintiff "sustained" actual damages. Finally, the provision permitting punitive damages states that they are available "in addition to any actual damages," see id. § 1691e(b) (emphasis added), rather than, for example, "in addition to the actual damages" shown. Nothing in the statute suggests actual damages must be alleged before a plaintiff can assert

11

a claim for punitive damages.[4] And, as described above, neither does standing jurisprudence. See also Cuellar-Aguilar v. Deggeller Attractions, Inc., 812 F.3d 614, 620-621 (8th Cir. 2015), reh'g denied (Feb. 10, 2016) ("where a federal statute provides for either statutory damages or actual damages, plaintiffs who fail to allege actual damages nonetheless [may] satisfy both the injury in fact and redressability requirements of Article III standing by suing for statutory damages" (emphasis added)).

Defendant also claims that punitive damages under the ECOA "must be pleaded with specificity," and that Dorton's claim fails because his complaint does not mention punitive damages. Id. (citing Fed. R. Civ. P. 9(g) ("[I]f an item of special damage is claimed, it must be specifically stated." (emphasis added))). Notably, the amended complaint does request all damages "as allowed by law." See Am. Compl. ¶ 86(d).

Defendants' Rule 9 argument is unpersuasive. "Special damages," as the term is used in Rule 9(g), are not the same as punitive damages. See Figgins v. Advance Am. Cash Advance Ctrs. of Michigan, Inc., 482 F. Supp. 2d 861, 869-870 (E.D. Mich. 2007). Noting a paucity of authority within the Sixth Circuit, Figgins exhaustively reviewed case law from across the country and concluded, quite persuasively, that "special damages" under Rule 9(g) do not include punitive damages provided by statute. See id. Moreover, whether Defendants have the correct meaning of a court rule does not bear on standing. See Steel Co., 523 U.S. at 89.

---

[4] Section 1691e(b) does list "the amount of actual damages awarded" as one of several "relevant factors" that the Court must consider in determining the amount of punitive damages to award. This, however, does not require that actual damages be alleged or suffered.

Accordingly, Dorton has standing to pursue his ECOA claim, because he was denied the notice to which he was entitled and, as a result, he was denied the opportunity to investigate more meaningfully his true creditworthiness.[5]

### B. Failure to State a Claim[6]

In the alternative to their standing arguments, Defendants allege that Dorton's claim must be dismissed, for failing to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6). See Defs. Mot. at 8. In order to proceed with his ECOA claim, Dorton must have pleaded facts establishing a plausible claim as to all of the following: (i) Defendants are creditors, requiring them to comply with the ECOA; (ii) Dorton is a credit applicant, entitling him to the protections of the ECOA; (iii) Defendants' refusal to proceed with Dorton's application constituted an "adverse action" with respect to Dorton's credit application; and (iv) Defendants failed to provide Dorton with an ECOA-compliant notice of its adverse action. See Madrigal v. Kline Oldsmobile, Inc., 423 F.3d 819, 822 (8th Cir. 2005). Defendant asserts that none of these things occurred.

Defendants first argue that Dorton is not a credit "applicant" because he never actually completed an application for credit, and an adverse action cannot take place until the creditor

---

[5] In light of the fact that Dorton's claim can only proceed "by virtue of statutes creating legal rights, the invasion of which creates standing," the Court declines to address Defendant's argument that an adverse action notice does not need to include the "source information" that Dorton seeks. See Def. Mot. at 5, 16. In addition to alleging that his adverse action notice lacked "source information," Dorton alleges that he requested an adverse action notice that contains "a specific statement of reasons for the adverse action taken," Am. Compl. ¶ 44, and that he received only an undated, handwritten response referring him to someone else, id. ¶ 45. Thus, even if an adverse action notice does not need to contain "source information," it needs to contain information that Dorton alleged was lacking.

[6] Although this Court lacks jurisdiction to consider Dorton's claim for actual damages, it should be noted that the reasoning in this section would apply to Dorton's claim for actual damages, had he adequately pleaded them.

13

received a "completed application" for credit. See Defs. Mot. at 10 (citing 15 U.S.C. § 1691(d)(1) ("Within thirty days . . . after receipt of a <u>completed application</u> for credit, a creditor shall notify the applicant of its action on the application.") (emphasis added)). The ECOA defines a credit "applicant" as "any person who applies to a creditor directly for an extension . . . of credit." 15 U.S.C. § 1691a(b).

Section 1691(d)(1), however, merely sets forth a thirty-day deadline applicable to the creditor who does receive a "completed application for credit." Presumably, this guards against a creditor improperly "denying" an application by failing to act on it at all. Contrary to the conclusion reached in case law cited by Defendants, see <u>Scripter v. First State Bank Mortg. Co., LLC</u>, No. 14-13461, 2015 WL 7756125, at *2 (E.D. Mich. Dec. 2, 2015), however, neither this statute nor the regulations state that a creditor cannot take "adverse action" until it receives a completed application for credit. In fact, the opposite is true: In the event that a creditor opts to take adverse action before an application is completed (as alleged here), the regulations specifically state that "[a] creditor shall notify an applicant of action taken within . . . (ii) 30 days <u>after taking adverse action on an incomplete application</u>, unless notice is provided in accordance with paragraph (c) of this section." 12 C.F.R. § 202.9(a)(1)(ii) (emphasis added). Moreover, the statute requires a creditor to supply an adverse action notice to "[e]ach applicant against whom adverse action is taken," without reference to whether the applicant's application was "complete." 15 U.S.C. § 1691(d)(2); <u>see also</u> 12 C.F.R. § 202.2(f) (distinguishing between "application" and "completed application," permitting inference that application can exist without being complete). <u>Scripter</u> — the only case cited by Defendants on this issue — failed to discuss any of this authority. 2015 WL 7756125, at *2-*3. Accordingly, the Court rejects Defendants' legal premise that a creditor only needs to provide an adverse action notice upon receipt of a completed application.

See also Kirk v. Kelley Buick of Atlanta, Inc., 336 F. Supp. 2d 1327, 1331-1333 (N.D. Ga. 2004) (discussing, at length, the adverse action notice requirements applicable to an incomplete application under 12 C.F.R. § 202.9).

Defendants next allege that, notwithstanding the 'completeness' issue, Dorton's application to lease the videogame system was not an application for "credit" subject to the ECOA, and that, by offering non-credit leases, Defendants were not acting as "creditors" covered by the ECOA. See Def. Mot. at 13. "The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d). Defendants claim that a lease application does not qualify as an application for credit "because it is a contemporaneous exchange of consideration for use of property," rather than a deferred payment of the property's purchase price. Defs. Mot. at 13-14. Dorton disagrees, arguing that it was a lease in name only; in fact, he was applying for a "monthly installment payment plan." See Pl. Resp. at 16.

Dorton does not make clear whether he is solely arguing that the Program was not, in fact, a lease, or if he is also arguing that, even if it was a lease, it was still covered by the ECOA. For the reasons stated below, as a preliminary matter, the Court concludes that the ECOA's definition of credit does not cover the typical lease. The lion's share of case law nationwide is in accord. See, e.g., Liberty Leasing Co. v. Machamer, 6 F. Supp. 2d 714, 719 (S.D. Ohio 1998) (equipment lease not credit transaction under ECOA); Robinson v. Veneman, 124 F. App'x 893, 896 (5th Cir. 2005) (possibility that lessor might eventually finance purchase does not create a credit transaction out of a lease under ECOA); Shaumyan v. Sidetex Co., Inc., 900 F.2d 16 (2d Cir. 1990) (incremental payments made as work progressed is not a credit transaction under ECOA); see also

Laramore v. Ritchie Realty Mgmt. Co., 397 F.3d 544, 547 (7th Cir. 2005) (adopting reasoning in Machamer for residential leases).

There is one prominent exception to this trend. The case on which Dorton relies, Brothers v. First Leasing, 724 F.2d 789 (9th Cir. 1984) (2-1), cert. denied, 469 U.S. 832 (1984), held that an automobile lease was a "credit transaction" within the ambit of the ECOA. But Brothers has been widely questioned. Most importantly, the controlling agency interpretation of the ECOA expressly rejects the majority's holding in Brothers, insofar as other circuits might be tempted to follow its reasoning, stating that "the Ninth Circuit interpreted the ECOA's definition of credit too broadly when it concluded in the Brothers case that the granting of a lease is an extension of credit." Equal Credit Opportunity, Revision of Regulation B, Official Staff Commentary, 1985 WL 126616, 50 Fed. Reg. 48018, 48019-20 (Nov. 20, 1985).[7] The Sixth Circuit explained in Bridgemill, 754 F.3d at 384, that the agency's interpretation of the ECOA is entitled to deference if it "survives the two-step inquiry of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.," 467 U.S. 837 (1984). At step one, this Court must ask whether Congress has directly addressed the precise question at issue; if so, Congress' intent naturally overrides a contrary regulatory construction. Bridgemill, 754 F.3d at 384. But if Congress was silent or the statute is ambiguous on the issue at hand, then the question for this Court is whether the agency's answer is based on a permissible construction of the statute. Id.

The statute in question does not compel an interpretation that Congress has answered "the precise question at issue" in a way that is consistent with Brothers' conclusion, i.e., that typical

---

[7] The Board of Governors for the Federal Reserve, which authored this interpretation, was the predecessor to the Consumer Financial Protection Bureau, the agency currently charged with promulgating and enforcing regulations for the ECOA. See RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC, 754 F.3d 380, 383 (6th Cir. 2014).

16

leases are included in the ECOA's definition of "credit" transactions. See Barney v. Holzer Clinic, Ltd., 110 F.3d 1207 (6th Cir. 1997) (parenthetically summarizing Brothers' holding as "applying ECOA to consumer leases, despite evidence that Congress had rejected such an application"). In addition to the lack of any language in the ECOA expressly identifying leases, this fact is shown by the criticisms leveled at the Brothers majority's holding, including those of the dissenting judge. See also Machamer, 6 F. Supp. 2d at 719; Ralph J. Rohner, Leasing Consumer Goods: The Spotlight Shifts to the Uniform Consumer Leases Act, 35 CONN. L. REV. 647 (2003) (criticizing Brothers).

Thus, even assuming that the statute is silent or ambiguous as to the issue at hand, the agency's construction of the statute in resolving that issue is permissible. "In answering this question, [one] need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading we would have reached if the question initially had arisen in a judicial proceeding." Alliance for Cmty. Media v. F.C.C., 529 F.3d 763, 778 (6th Cir. 2008). In addition to the relative clarity of the Brothers dissent, and the Brothers majority's status as an outlier, the text of the statute itself can be permissibly read to exclude the typical lease. Section 1691a defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d) (emphasis added). "The hallmark of 'credit' under the ECOA is the right of one party to make deferred payment." Riethman v. Berry, 287 F.3d 274, 277 (3d Cir. 2002). "The relevant inquiry is whether the incremental payments constitute a contemporaneous exchange of consideration for the possession of the leased goods. Where the leasing agreement, or applicable law, provides for such a contemporaneous exchange, then the lessee cannot be said to 'defer the payment of a debt' within the meaning of ECOA."

17

Machamer, 6 F. Supp. 2d at 717. Simply put, a lease payment, as it is commonly structured, is not a "defer[red] payment of debt."[8] Rather, it is a payment made contemporaneously with the use of the thing being leased; the lessee is never properly considered "in debt" to the lessor. The agency's construction of the ECOA, therefore, is permissible at the very least and must be given deference.

Indeed, at least one court in this circuit has expressly declined to follow the Ninth Circuit's interpretation of the ECOA and its regulations, citing the agency's concerns. See id. at 719. And, although it was not central to the issue before it, the Sixth Circuit has voiced doubt as to Brothers. See Barney, 110 F.3d at 1213 (declining to sanction appellants because "[a] decision in favor of appellants would not be the first time that a court of appeals had applied the ECOA to transactions that do not seem to be a credit transaction." (citing Brothers, 724 F.2d at 796)); see also Shaumyan v. Sidetex Co., Inc., 900 F.2d 16 (2d Cir. 1990) (rejecting argument made in reliance on Brothers and holding that incremental payments made "substantially contemporaneous" with payee's performance is not a credit transaction). Accordingly, this Court defers to the interpretation of the ECOA set forth by the agency charged with its enforcement and holds that, as a matter of law, the ECOA does not apply to a typical lease transaction.

Having determined that an application for a lease does not trigger the ECOA's adverse action notice requirements, one question remains: did the WhyNotLeaseIt Program offer a contemporaneous exchange of property for consideration (i.e., a lease), or credit transactions?

---

[8] As the Seventh Circuit has noted, an arrangement labeled a "lease" could nonetheless be crafted such that it "might, by its terms, come under the terms of the ECOA." Laramore, 397 F.3d at 547 n.2. For that reason, the Court will dissect the terms of the instant Program to see whether it is a typical lease, see infra, rather than rely solely on its rejection of Brothers.

Both parties are able to highlight language in the Program's promotional materials that seems to purport to label the Program as either a lease or a credit transaction.[9] However, how the Program <u>actually operates</u> is dispositive. See <u>Machamer</u>, 6 F. Supp. 2d at 717. The Program's "Frequently Asked Questions" publication, attached to Dorton's amended complaint as Exhibit 5, provides:

> [Q:] Is this a rent-to-own program?
>
> [A:] No, this is a leasing program. You make the payments and at the end of the minimum 5 month term you have the option to renew the lease, return the item or purchase the item in early buyout when eligible. We do NOT offer a 90 day same as cash option.
>
> \*   \*   \*
>
> [Q:] Can I buy the merchandise if I decide to keep it?
>
> [A:] Yes! After the 5 period minimum term you may buy your merchandise for a portion of the remaining depreciated value of the item(s).

Similarly, another advertisement for the Program, attached to Dorton's amended complaint as Exhibit 6 (Dkt. 19-6), begins with the statement "Here's how leasing works at Kmart" and provides:

> After making your first payment in the store, take [the product] home. You'll make additional minimal payments that allow you to keep your items for the time period of your choice. . . .
>
> You decide what happens next! Lease it again with bi-weekly payments for 5 months or take advantage of our 30, 60, and 90-day

---

[9] For example, Defendant WhyNotLeasing advertises the Program as an option "for your <u>purchase</u>." Am. Compl. at ¶ 9 (citing "Easy Terms," Ex. 1 to Am. Compl. (Dkt. 19-2)). And, in marketing its services to potential retailers, WhyNotLeasing claims that retailers will "never lose a <u>sale</u> to bad credit again." <u>Id.</u> at ¶ 11 (citing "For Dealers," Ex. 3 to Am. Compl. (Dkt. 19-4)). On the other hand, Defendants can point to the name of the Program itself (i.e., "WhyNotLeaseIt"), as well as its frequent use of the term "lease." See Ex. 5 to Am. Compl. (Dkt. 19-5) (referring to customer's "first lease payment").

19

      early purchase option and own it for slightly more than the lease cost.

Both of these exhibits prove that the Program does not offer "credit"; payments under the Program do not function as "deferred payment" of the item's purchase price — because there is no purchase price. The lessee, by entering into the Program, has no obligation whatsoever to purchase the product, and, if he does nothing except make the minimum payments on the lease, he must eventually return the product to Defendants. This flatly contradicts Dorton's interpretation that the Program amounts to "a monthly installment payment plan," Pl. Resp. at 16. The lease payments are not deferred payments on the purchase of any property; rather, they are payments made as a "contemporaneous exchange of consideration for the right of <u>possession</u> and <u>use</u> of the equipment." <u>Machamer</u>, 6 F. Supp. at 717 (emphasis added). Accordingly, an ECOA claim against Defendants, when founded upon the Program as it is described in Plaintiff's complaint, fails to state a claim upon which relief can be granted.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss (Dkt. 25) is granted. Dorton's action is dismissed with prejudice. A separate judgment will enter.

SO ORDERED.

Dated: January 26, 2017        s/Mark A. Goldsmith
    Detroit, Michigan        MARK A. GOLDSMITH
                                   United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 26, 2017.

                                                                  s/Karri Sandusky
                                                                  Case Manager